Case No. 25-1490
Consolidated with Case No. 25-1515

---

In the
United States Court of Appeals
for the Eighth Circuit

---

KEITH CARNES,

*Plaintiff-Appellee,*

v.

ROBERT BLEHM, ET AL.

*Defendants- Appellants.*

_____

On Appeal from the United States District Court
for the Western District of Missouri
No. 4:23-cv-00278-RK (The Hon. Roseann A Ketchmark, District Judge)

---

**RESPONSE BRIEF OF APPELLEE KEITH CARNES**

---

Locke Bowman
Jordan Poole
LOEVY & LOEVY
311 N. Aberdeen St., Third Floor
Chicago, Illinois 60607
(312) 243-5900

Counsel for Appellee
July 24, 2025

## SUMMARY OF THE CASE AND
## STATEMENT REGARDING ORAL ARGUMENT

Plaintiff-Appellee Keith Carnes ("Plaintiff") sued members of the Kansas City Police Department (the "Defendant Officers") and Amy McGowan ("McGowan"), a prosecutor with the Jackson County Prosecutor's Office for constitutional violations they committed during their investigation of the October 6, 2003 murder of Larry White in Kansas City. Plaintiff was wrongfully convicted of that murder and spent eighteen years in prison as an innocent man. His conviction was vacated in April 2022 by order of the Supreme Court of Missouri and the murder charges against Plaintiff have been dismissed.

Following discovery, Defendants moved for summary judgment on various grounds including claims of qualified immunity and, in McGowan's case, prosecutorial immunity. The district court denied the immunity claims in part and Defendant Officers and McGowan have filed separate interlocutory appeals.

Defendant Officers and McGowan have each requested 15 minutes of oral argument. Plaintiff believes 10 minutes would be sufficient. Plaintiff requests that he be allotted time equal to the combined total time allowed to the two separate appellants.

i

**CORPORATE DISCLOSURE STATEMENT**

Keith Carnes brought this lawsuit in his individual capacity. He is therefore not required to file a disclosure statement under Fed. R. App. P. 26.1.

Appellate Case: 25-1490     Page: 3     Date Filed: 07/24/2025 Entry ID: 5541141

# TABLE OF CONTENTS

SUMMARY OF THE CASE AND STATEMENT
REGARDING ORAL ARGUMENT ........................................................................ i

CORPORATE DISCLOSURE STATEMENT ........................................................ ii

TABLE OF CONTENTS .......................................................................................... iii

TABLE OF AUTHORITIES ..................................................................................... v

JURISDICTIONAL STATEMENT ......................................................................... 1

STATEMENT OF ISSUES ....................................................................................... 2

STATEMENT OF THE CASE ................................................................................. 4

I.    The Murder of Larry White and the Initial Investigation ............................ 5

II.   Defendants Find the Murder Weapon ......................................................... 6

III.  Wendy Lockett is Questioned on October 7 ............................................... 7

IV.   McGowan Coerces Lorrianne Morrow ...................................................... 8

V.    Blehm and Williamson Interview Morrow ................................................. 10

VI.   Lockett is Coerced to Identify Plaintiff .................................................... 11

VII.  Additional Evidence Develops Implicating Thomas, Kitchen
      and Powell .............................................................................................. 13

VIII. Plaintiff is Charged Based Solely on Unreliable Statements .................... 16

IX.   Plaintiff is Wrongfully Convicted ............................................................ 17

X.    Plaintiff is Exonerated ............................................................................. 19

XI.   These Proceedings ................................................................................... 20

SUMMARY OF THE ARGUMENT ....................................................................... 21

Appellate Case: 25-1490    Page: 4    Date Filed: 07/24/2025 Entry ID: 5541141

ARGUMENT ...................................................................................................25

I.  THE DISTRICT COURT PROPERLY REJECTED QUALIFIED
    IMMUNITY AS TO PLAINTIFF'S CLAIM THAT THE DEFENDANT
    OFFICERS CONDUCTED A RECKLESS INVESTIGATION
    IN VIOLATION OF DUE PROCESS ...........................................................25

    A.  The Right to Be Free of Reckless Investigation Was Clearly
        Established at the Time of the Investigation in this Case. .................25

    B.  The District Court Correctly Held that a Reasonable Jury Could
        Conclude that Defendant Officers' Investigation was "Reckless"
        and "Conscience Shocking." ...............................................................26

    C.  Defendant Officers Cannot Succeed on Appeal by Attempting to
        Recast the Facts So as to Minimize or Excuse Their Misconduct. .....36

II. THE DISTRICT COURT PROPERLY REJECTED DEFENDANT
    MCGOWAN'S IMMUNITY CLAIMS AT SUMMARY JUDGMENT .....41

    A.  The District Court Properly Found that McGowan Cannot Sustain
        Her Prosecutorial Immunity Defense at Summary Judgment.............41

    B.  The District Court Properly Rejected McGowan's Qualified
        Immunity Defense. ..............................................................................49

    C.  McGowan is Not Entitled to Official Immunity. ...............................54

CONCLUSION ...............................................................................................55

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT,
TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS ..........57

CERTIFICATE OF SERVICE ........................................................................58

iv

## TABLE OF AUTHORITIES

**Cases**                                                        **Page(s)**

*Am. Red Cross v. Cmty. Blood Ctr. of the Ozarks*,
257 F.3d 859 (8th Cir.2001) ...................................................................52

*Amrine v. Brooks,*
522 F.3d 823 (8th Cir. 2008) ................................................................35

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ...............................................................................44

*Boude v. City of Raymore, Missouri*,
855 F.3d 930 (8th Cir. 2017) .............................................................3, 54

*Brady v. Maryland*,
373 U.S. 83 (1963) .................................................................................53

*Brown v. Mississippi*,
297 U.S. 278 (1936) ...............................................................................53

*Buckley v. Fitzsimmons,*
509 U.S. 259 (1993) ................................................................ 2, 24, 42, 43

*Burns v. Reed*,
500 U.S. 478 (1991) ...............................................................................43

*Button v. Dakota, Minn. & E. R.R. Corp.,*
963 F.3d 824 (8th Cir. 2020) .................................................................45

*Clemmons v. Armontrout,*
477 F.3d 962 (8th Cir. 2007) .................................................................36

*Conolly v. Clark,*
457 F.3d 872 (8th Cir. 2006) ............................................................ 46, 47

*Cox v. Mortgage Electronic Registration System, Inc.*,
685 F.3d 663 (8th Cir. 2012) .............................................................3, 53

*Dreith v. City of St. Louis, Missouri*,
55 F.4th 1145 (8th Cir. 2022) ................................................................54

v

| Cases | Page(s) |
|---|---|

*Engesser v. Fox*,
   993 F.3d 626 (8th Cir. 2021) ........................................................ 37, 38

*Franklin for Estate of Frankin v. Peterson*,
   878 F.3d 631 (8th Cir. 2017) ............................................................39

*Garang v. City of Ames,*
   2 F.4th 1115 (8th Cir. 2021) ...................................................... 44, 45

*Gullick v. Ott,*
   517 F. Supp. 2d 1063 (W.D. Wis. 2007) ..........................................46

*Gunning v. Cooley*,
   281 U.S. 90 (1930) ...........................................................................49

*Hayes v. Faulkner County,*
   388 F.3d 669 (8th Cir. 2004) ............................................................37

*Heisler v. Metropolitan Council*,
   339 F.3d 662 (8th Cir. 2003) ............................................................52

*Jenkins v. Winter*,
   540 F.3d 742 (8th Cir. 2008) ............................................................50

*Johnson v. Jones,*
   515 U.S. 304 (1995) .......................................................................1, 4

*Kemp v. McReynolds*,
   621 S.W.3d 644 (Mo. Ct. App. 2021) ..............................................55

*Kuehl v. Burtis*,
   173 F.3d 646 (8th Cir. 1999) ............................................................35

*McGhee v. Pottawattamie Cnty.*,
   547 F.3d 922 (8th Cir. 2008) ................................................ 2, 43, 50

*Mitchell v. Forsyth*,
   472 U.S. 511 (1985) ...........................................................................1

Appellate Case: 25-1490   Page: 7   Date Filed: 07/24/2025 Entry ID: 5541141

| Cases | Page(s) |
|---|---|

*Mooney v. Holohan*,
  294 U.S. 103 (1935)............................................................53

*Moran v. Clarke*,
  296 F.3d 638 (8th Cir. 2002)...........................................26

*Napue v. Illinois*,
  360 U.S. 264 (1959) ........................................................53

*Nguyen v. Grain Valley R-5 Sch. Dist.*,
  353 S.W.3d 725 (Mo. App. W.D. 2011) .............................55

*Pyle v. Kansas*,
  317 U.S. 213 (1942) ........................................................53

*Russell v. Acme-Evans Co.*,
  51 F.3d 64 (7th Cir. 1995)...............................................46

*Sample v. City of Woodbury*,
  836 F.3d 913 (8th Cir. 2016).............................................43

*Solomon v. Petray*,
  795 F.3d 777 (8th Cir. 2015) .............................................4

*Southers v. City of Farmington*,
  263 S.W.3d 603 (Mo. Banc 2008).....................................54

*Spann v. Lombardi*,
  960 F.3d 1085 (8th Cir. 2020) ..........................................51

*State ex rel. Alsup v. Kanatzar*,
  588 S.W.3d 187 (Mo. Banc 2019).....................................55

*Stockley v. Joyce*,
  963 F.3d 809 (8th Cir. 2020) ............................................42

*Taylor v. St. Louis Community College*,
  2 F.4th 1124 (8th Cir. 2021)............................... 1, 39, 40, 49

*Thompson v. Murray*,
  800 F.3d 979 (8th Cir. 2015).............................................49

Appellate Case: 25-1490    Page: 8    Date Filed: 07/24/2025 Entry ID: 5541141

| Cases | Page(s) |
|---|---|

*United States ex rel. Ambrosecchia v. Paddock Lab'ys, LLC*,
  855 F.3d 949 (8th Cir. 2017) ..............................................................50

*United States v. Bear,*
  116 F.3d 349 (8th Cir. 1997) ..............................................................47

*United States v. Mayfield*,
  909 F.3d 956 (8th Cir. 2018) ..............................................................49

*United States v. Nosley*,
  62 F.4th 1120 (8th Cir. 2023) .............................................................48

*United States v. Provost,*
  969 F.2d 617 (8th Cir. 1992) ..............................................................47

*Walz v. Randall,*
  2 F.4th 1091 (8th Cir. 2021) ....................................................... *passim*

*White v. Smith*,
  696 F.3d 740 (8th Cir. 2012) ....................................................... 26, 34

*Whittington v. Tyson Foods, Inc.*,
  21 F.4th 997 (8th Cir. 2021) ............................................................3, 51

*Wilson v. Lawrence County,*
  260 F.3d 946 (8th Cir. 2001) ....................................................... 25, 35

*Winslow v. Smith*,
  696 F.3d 716 (8th Cir. 2012) ....................................................... *passim*

*Woodworth v. Hulshof,*
  891 F.3d 1083 (8th Cir. 2018) ........................................................2, 42

Appellate Case: 25-1490     Page: 9     Date Filed: 07/24/2025 Entry ID: 5541141

# JURISDICTIONAL STATEMENT

Defendant Officers and McGowan each filed timely notices of appeal from the district court's order denying in part their claimed immunity defenses. Defendant Officers and McGowan invoke this Court's interlocutory jurisdiction pursuant to the collateral order doctrine and *Mitchell v. Forsyth*, 472 U.S. 511 (1985). To that extent, the jurisdictional statements in both of the appellants' briefs are correct.

However, this Court's jurisdiction in interlocutory immunity appeals is limited to "abstract issues of law." *Johnson v. Jones,* 515 U.S. 304, 317 (1995). As set forth at various places in Plaintiff's Argument, *infra,* Defendant Officers and McGowan both include arguments that exceed the Court's limited interlocutory jurisdiction, asking the Court to set aside certain of the district court's factual findings, to re-analyze the factual record, and/or to resolve genuine factual disputes against Plaintiff. This Court does not have jurisdiction to consider these arguments. *Taylor v. St. Louis Community College*, 2 F.4th 1124, 1127-28 (8th Cir. 2021).

1

**STATEMENT OF ISSUES**

1.      Whether a reasonable jury could conclude that Defendant Officers'
investigation of the murder of Larry White was reckless and conscience shocking
when, among other things, Defendant Officers pressured vulnerable eyewitnesses
to provide statements inculpating Plaintiff through threats and other coercive
action; concealed and suppressed the eyewitnesses' assertions that persons other
than Plaintiff committed the murder; and, despite substantial evidence against
those other persons, failed to pursue investigative steps in relation to those persons.

*Winslow v. Smith*, 696 F.3d 716 (8th Cir. 2012)

*Walz v. Randall,* 2 F.4th 1091 (8th Cir. 2021)

2.      Whether the district court properly rejected McGowan's defense of
prosecutorial immunity at the summary judgment stage because the facts on which
the defense turns were disputed and the availability of prosecutorial immunity
could not be determined.

*Buckley v. Fitzsimmons,* 509 U.S. 259 (1993)

*Woodworth v. Hulshof*, 891 F.3d 1083 (8th Cir. 2018)

3.      Whether McGowan can seek qualified immunity in this Court based
on arguments she never made in the district court and that she has not developed in
her brief in this Court with citations to the record or to pertinent case authority.

*McGhee v. Pottawattamie Cnty.*, 547 F.3d 922 (8th Cir. 2008)

2

*Whittington v. Tyson Foods, Inc.*, 21 F.4th 997, 1002 n.4 (8th Cir. 2021)

*Cox v. Mortgage Electronic Registration System, Inc.*, 685 F.3d 663 (8th Cir. 2012)

4.     Whether the district court properly denied McGowan's request for state law official immunity as to Plaintiff's state law claims against her because a reasonable jury could infer from the facts in the record that McGowan acted in bad faith or from an improper motive.

*Boude v. City of Raymore, Missouri*, 855 F.3d 930, 935 (8th Cir. 2017)

3

## STATEMENT OF THE CASE

Plaintiff Keith Carnes spent 18 years in prison for the October 2003 murder of Larry White, a crime he did not commit. App. 1958; R. Doc. 148 at 11, ¶ 23.[1] In April 2022, Plaintiff's conviction was overturned after it was revealed that Defendant Kansas City Officers Blehm and Williamson concealed exculpatory evidence related to an interview of Wendy Lockett, a key eyewitness. App. 2031; R. Doc. 148 at 84, ¶ 146. He then filed this lawsuit.

In these interlocutory appeals, Defendants challenge the district court's denial of their claims of qualified and prosecutorial immunity at summary judgment. This Court's jurisdiction is therefore strictly limited to the assessment of "abstract issues of law," while accepting the facts and inferences in the district court's summary judgment ruling. *See generally Johnson v. Jones,* 515 U.S. 304, 316-17 (1995). The facts set forth below are drawn primarily from the district court's summary judgment opinion App. 1-44; R. Doc. 224, supplemented as necessary with additional facts from the summary judgment record. *Solomon v. Petray*, 795 F.3d 777, 786 (8th Cir. 2015) ("On appeal, we [] look at whether the official is entitled to qualified immunity based on the summary judgment facts as described by the district court.").

---

[1] Page citations to R. Doc. 148 refer to the filed page numbers (in blue), not the internal pagination.

4

## I.    The Murder of Larry White and the Initial Investigation

Shortly before 9:00 p.m. on the evening of October 6, 2003, Larry White was shot and killed in Kansas City, Missouri somewhere along 29th Street between Olive Street (on the east) and Prospect Avenue (on the west). App. 2-3; R. Doc. 224 at 2-3. White's body was found where he collapsed, in the parking lot of the "Fish Town" restaurant, located at the terminus of 29th Street at Prospect. *Id.*; App. 2015; R. Doc. 148 at 68, ¶¶ 1, 10. Officers from the Kansas City Police Department were dispatched to the shooting at around 8:50 p.m. *Id.*

Defendants Robert Blehm and Avery Williamson ("Defendant Officers") conducted the homicide investigation along with other non-defendant Kansas City police officers. App. 3; R. Doc. 224 at 3. Defendant Blehm was assigned to lead the investigation. *Id.* Defendant Williamson, a detective in training, worked under Blehm's direct supervision. *Id.*

At the crime scene, Blehm observed 13 shell casings; the closest of which was at least 40 yards away from White's body. *Id*. No bullets, bullet fragments, or shell casings were ever found in the Fish Town parking lot where White collapsed. *Id*. White's injuries were also inconsistent with a point-blank rifle shot. App. 2024-25; R. Doc. 148 at 77-78, ¶¶ 83-85. Witnesses who were present at the Fish Town parking lot at the time White collapsed testified that no shots were fired from within that parking lot. App. 2024; R. Doc. 148 at 77, ¶ 84. The physical and

5

forensic evidence therefore made clear that there was no close-range shooting of White in the Fish Town parking lot. App. 3; R. Doc. 224 at 3; App. 2024-25; R. Doc. 148 at 77-78 ¶¶ 83-85.

Officers on the scene that night questioned several witnesses who heard gunshots but had not seen the shooting. App. 3; R. Doc. 224 at 3. Following these initial interviews, Defendants had no suspects in custody and no eyewitness leads. *Id.*; R. Doc. 148 at 18 ¶¶ 52-53.

## II. Defendants Find the Murder Weapon

The day after the murder, according to a report authored by Blehm, the victim's uncle, Ronald White Sr., contacted the police department and stated he had information about White's murder. App. 3; R. Doc. 224 at 3. According to Blehm's report, Blehm then interviewed Ronald White Sr., who stated that earlier that day he heard a Black man he knew as "O.G." bragging that he had killed White. *Id*. According to the report, Blehm then showed Ronald White Sr. several photos and he identified a photograph of Arnold Carr as "O.G.". *Id.*

Defendant Blehm applied for and obtained a search warrant for Carr's apartment: Apartment 1W in an apartment building located at 2404 E. 29th Street, two blocks west of the Fish Town parking lot where Larry White's body was found. App. 4; R. Doc. 224 at 4. While executing the warrant at Carr's apartment, Blehm noticed that adjacent apartment (1E) appeared to be vacant. *Id.* Defendant

6

Officers requested and received permission from the building's owner to search that unit as well. *Id*.

During the search of Apartment 1E, Defendant Officers located an assault rifle hidden in the freezer compartment of a refrigerator, which was determined to have fired the shell casings recovered at the scene. App. 4; R. Doc. 224 at 4; App. 3602; R. Doc. 149-15. Gary Kitchen later admitted that this weapon was his. App. 4; R. Doc. 224 at 4; App. 2026; R. Doc. 148 at 79 ¶ 97. Defendant Officers' search also yielded $464 in cash, ammunition, and small baggies. App. 3602; R. Doc. 149-15.

### III. Wendy Lockett is Questioned on October 7

On October 7, 2003, the same day Blehm executed the search warrant on Carr's apartment, Kansas City police officers Huth and Begley interviewed Wendy Lockett, a drug-addicted prostitute who frequented the neighborhood. App. 4-5; R. Doc. 224 at 4-5; App. 2017; R. Doc. 148 at 70, ¶ 22. Huth authored a report memorializing the interview, which referred to Lockett only as a "confidential informant," and not by name. App. 5; R. Doc. 224 at 5. The report states that Lockett "observed a black male running from 29th and Olive (apartment buildings), being pursued by two other black males who were firing guns at him…[t]he two black males continued pursuing [the victim] while firing rounds from an unknown weapon." *Id*. Lockett did not provide any further details. Huth's

7

report of the interview with Lockett contains no description of either shooter beyond "black male." The report also does not include a description of the gun or guns that either male was firing. *Id.*

That same day, following his interview, Huth referred Lockett to homicide detectives, likely Defendant Blehm. *Id.* Neither Huth's report nor the fact of Lockett's failure to identify either shooter or describe their weapons was disclosed to Plaintiff prior to his criminal trials. *Id.*

## IV.   McGowan Coerces Lorrianne Morrow

As Defendant Officers were interrogating witnesses and conducting their investigation, then-Jackson County prosecutor, Amy McGowan coerced Lorrianne Morrow, also a drug addict and a prostitute, to falsely identify Plaintiff as the shooter. App. 10; R. Doc. 224 at 10. McGowan was the "charging attorney" in the Jackson County prosecutor's office responsible for interfacing with the police during the investigation of the White murder. App. 1450-51; R. Doc. 147 at 7-9 ¶¶ 8-11. She has no memory of her work on this case. App. 10; R. Doc. 224 at 10. Morrow has testified to her recollections of her interactions with McGowan in an affidavit dated October 3, 2014, a deposition in 2021 given in connection with Plaintiff's state habeas proceeding, and in a 2024 deposition in this case. App. 1138; R. Doc. 139-24; App. 1168; R. Doc. 139-25; App. 1414; R. Doc. 140-2; App. 1904; R. Doc. 147-3.

8

McGowan has been dogged by allegations of prosecutorial misconduct in other cases, most famously the case of Ricky Kidd, whose conviction was overturned based upon a finding that McGowan had failed to disclose material exculpatory evidence to the defense. App. 1461-62; R. Doc. 147 at 18-19 ¶¶ 15-18.

According to Morrow, a couple of days after White's murder (and before Morrow later spoke to Blehm and Williamson on October 12, 2003) McGowan visited the neighborhood where the shooting occurred and where Morrow could be found. App. 10; R. Doc. 224 at 10. Morrow spoke to McGowan two or three times between October 9 and October 12, 2003, and McGowan took Morrow to her office for an interview. *Id.*

During these conversations, Morrow told McGowan that she had witnessed Reginald Thomas and Gary Kitchen shoot White. *Id.* Like Kitchen, Thomas was associated with Carr's apartment. McGowan told Morrow that, contrary to her statement, Plaintiff had killed White, and showed her a photo of Plaintiff, stating that he was the one who had killed White. *Id*. McGowan threatened Morrow with drug possession charges and jail time, told Morrow that she would plant drugs on her, and told Morrow that she would lose her kids if she did not agree to say that Plaintiff was the shooter. *Id*. In her 2024 deposition, Morrow described McGowan's coercion: "She [referring to McGowan] said to me, 'If you don't say this [i.e., that Plaintiff was the shooter], I will plant drugs on you. You will go to

9

jail.' And I have never been in jail in my life. And I was scared, so I did what I was told because I had—at the time I had seven children." App. 2023; R. Doc. 148 at 76, ¶ 70. Because of McGowan's threats, Morrow agreed to falsely implicate Plaintiff in the White murder. App. 10; R. Doc. 224 at 10.

## V.    Blehm and Williamson Interview Morrow

On October 12, 2003, following McGowan's interactions with Morrow, Blehm and Williamson interviewed her. App. 5; R. Doc. 224 at 5. Morrow initially told Blehm and Williamson that Thomas murdered White, not Plaintiff, and that Kitchen was also present with a firearm. App. 10; R. Doc. 224 at 10; App. 2023; R. Doc. 148 at 76 ¶¶ 72, 74. Blehm and Williamson made no record of Morrow's initial identification of Thomas and Kitchen as the murderers. App. 10; R. Doc. 224 at 10. Morrow then provided a false statement, tracking the story McGowan had pressed upon her, which asserted that she witnessed Plaintiff chase White and shoot a firearm (which she described as long and black with a clip, maybe a ".44 or a AK-47") three times at White. App. 5; R. Doc. 224 at 5. Morrow stated that she also saw Gary Kitchen, who had a smaller firearm, chase White, but that he did not shoot. *Id.*

Morrow also stated that after White collapsed in the Fish Town parking lot, Plaintiff rolled White over and shot him five more times, an assertion at odds with

10

the physical and forensic evidence at the scene. App. 3, 5; R. Doc. 224 at 3, 5; App. 2024-25; R. Doc. 148 at 77-78 ¶¶ 83-85.

## VI. Lockett is Coerced to Identify Plaintiff

One week after Lockett's October 7 statement to Officers Huth and Begley, which provided no description or identification of the two Black men pursuing White, Huth and Begley, at the request of Defendant Williamson, arrested Lockett and transported her to police headquarters to be interviewed again. App. 2019; R. Doc. 148 at 72, ¶ 41; App. 6; R. Doc. 224 at 6. At the time, Lockett was under the influence of drugs, and Huth and Begley knew she was in active addiction. App. 1977; R. Doc. 148 at 30, ¶ 112; App. 6; R. Doc. 224 at 6.

Defendant Williamson interrogated Lockett while Defendant Blehm watched and listened. App. 6; R. Doc. 224 at 6. Lockett, under duress, signed a false typed statement stating that Lockett observed a confrontation between Plaintiff and White and that Plaintiff had retrieved a gun—which she described as "one of them long things with a banana clip like"—and started chasing and shooting at White. *Id*. Like Morrow's statement, Lockett's statement asserted, contrary to evidence, that when White collapsed in the Fish Town parking lot, Plaintiff, who was wearing an eye patch, walked up to White and shot him in the head. *Id*. Lockett also stated that two other men—Damon Rhodes and Mitchell Powell—were armed and with Plaintiff when the shooting occurred. *Id.*

11

Following Lockett's statement, officers learned that Rhodes had an indisputable alibi; he was depicted in a video cleaning a bank in Kansas at the time of the murder. *Id.*

Lockett has since explained that Defendant Officers fed her facts about the crime. Lockett knew what the police wanted her to say in her false statement because "[t]hey basically told [Lockett] what happened," App. 2021; R. Doc. 148 at 74, ¶ 54, and that they gave her "details of everything" related to the homicide. App. 2021; R. Doc. 148 at 74, ¶ 55. For example, Williamson told Lockett that the murder weapon had a "banana clip," and that Plaintiff allegedly walked a certain direction during the shooting. App. 2021; R. Doc. 148 at 74, ¶ 54. Lockett did not read her final statement before signing it. App. 2021; R. Doc. 148 at 74, ¶ 55.

During her deposition in this case, Lockett testified that she did not witness an argument between Plaintiff and White that day and did not see anyone chasing White or see anyone shoot him in the parking lot. App. 10-11; R. Doc. 224 at 10-11. Lockett did not see a banana clip and in fact, did not see a clip at all, nor did she see an eye patch on the shooter. App. 11; R. Doc. 224 at 11. Lockett explained that Defendant Williamson told her what happened, and she agreed to it, even though she did not know who the shooter was. *Id.*

Lockett testified at her deposition in this case that she felt "pressured" and "under duress" to identify Plaintiff. App. 1977; R. Doc. 148 at 30, ¶ 112. At the

12

time of her interview, Lockett was under the influence and an active addict. *Id*. Police knew that Lockett was an active addict because other officers involved in the investigation had previously arrested her and her son for drug-related offenses. App. 1978; R. Doc. 148 at 31, ¶ 114. Lockett believed Defendant Williamson would "keep [her] locked up" if she denied knowing details about the homicide. App. 2021; R. Doc 148 at 74, ¶ 55. Williamson asked Lockett questions designed to elicit a statement implicating Plaintiff. App. 2021; R. Doc 148 at 74, ¶ 53. Eventually, Locket acquiesced to the pressure and "agreed to say a lot of things because [she] was trying to get back out on the streets." App. 2021; R. Doc 148 at 74, ¶ 51. Lockett testified that "I was confused. I was scared. I just felt under duress the whole time. Just the whole time. Because I'm pressured to do this, to say this." App. 1977; R. Doc. 148 at 30, ¶ 112.

## VII. Additional Evidence Develops Implicating Thomas, Kitchen and Powell

On October 8, 2003, following the search of his apartment, Blehm and Williamson also interrogated Arnold Carr. App. 5; R. Doc. 224 at 5. Carr provided Blehm and Williamson with an alibi that was verified as the interrogation was ongoing. *Id*. But Carr admitted to selling drugs out of his apartment with Gary Kitchen (the owner of the murder weapon), Reginald Thomas, Damon Rhodes, and Mitchell Powell. *Id.*

13

The same day as Lockett's second interview, October 14, 2003, Margo Thomas (no relation to Reginald Thomas) told officers that Reginald Thomas was at the apartment building near the scene of the crime the day of the shooting. App. 6; R. Doc. 224 at 6.

Also on October 14, Kitchen was arrested and questioned by non-defendant officers. He denied being in the area of the shooting. *Id.* Defendants Williamson and Blehm then interviewed Kitchen, who reversed course and admitted he was in the area selling drugs, but now claimed he left before the shooting and overheard the gunshots while at his nearby home at 2700 Park Avenue. *Id.* Kitchen admitted that the murder weapon belonged to him. App. 2026; Doc. 148 at 79 ¶ 97. He did not provide any alibi. App. 6; R. Doc. 224 at 6. Kitchen said that when he left the apartment building near the scene, Carr and Powell were present. *Id.*

Officers also eventually detained and interrogated Reginald Thomas. App. 7; R. Doc. 224 at 7. Thomas claimed he was watching his girlfriend's children at the time of the murder and that he was with Kitchen and other members of the Kitchen family—although Kitchen had made no mention of seeing Thomas or being in Thomas's company the day of the murder. *Id.*; App. 2027; R. Doc. 148 at 80 ¶ 104. Thomas claimed he was never inside Carr's apartment on the night of the shooting. App. 7; R. Doc. 224 at 7. Defendant Officers then released him.

14

A non-defendant officer interviewed Felicia Jones, another neighborhood addict, who signed a statement—which she disavowed at Plaintiff's trial—asserting that she witnessed the shooting after she had gone to Carr's apartment to get drugs. *Id*. According to the statement, Jones stated that Thomas was sitting on the couch and said "make him disappear" referring to the "kid selling on the corner." *Id*. Jones's statement asserts that, when Jones left the apartment, she saw Plaintiff retrieve guns and then saw Plaintiff and Powell shooting at the kid who had been selling on the corner, running toward Fish Town. *Id*.

Some days later, investigators arrested Mitchell Powell for questioning about the shooting. But Powell was released after he refused to speak with investigators. *Id.*

Thus, Defendant Officers' investigation developed evidence implicating at least three individuals other than Plaintiff:

**Gary Kitchen** was the self-admitted owner of the murder weapon. App. 2026; Doc. 148 at 79 ¶ 97; App. 4; R. Doc. 224 at 4. According to eyewitness Morrow, Kitchen either murdered White along with Reginald Thomas (as Morrow told McGowan) or was present when Thomas murdered White (as she told the Defendant Officers). App. 10; R. Doc. 224 at 10; App. 2023; R. Doc. 148 at 76 ¶¶ 72, 74. Under questioning, Kitchen provided shifting accounts of his whereabouts, first claiming to be nowhere near the scene on the day of the murder and then

15

admitting he was present but claiming to have left for home shortly before the crime. App. 2026; Doc. 148 at 79 ¶¶ 97-99; App. 6; R. Doc. 224 at 6.

**Reginald Thomas** was identified as the shooter by eyewitness Morrow in her initial statements both to McGowan and to the Defendant Officers. App. 10; R. Doc. 224 at 10; App. 2023; R. Doc. 148 at 76 ¶¶ 72, 74. Under questioning, Thomas claimed to have been at Kitchen's home at the time of the shooting, but that statement conflicted with Kitchen's—which made no mention of Thomas being in his home. App. 7; R. Doc. 224 at 7; App. 2027; R. Doc. 148 at 80 ¶ 104. Thomas's insistence that he was never inside Carr's apartment on the day of the shooting was contradicted by witness Margo Thomas, who said that Reginald was at the Carr apartment and by another witness, Felicia Jones, would said that Thomas, seated on a couch in the apartment, said words to the effect that White should be made to "disappear." App. 6-7; R. Doc. 224 at 6-7.

**Mitchell Powell** was identified by eyewitnesses Lockett as being present and with the shooter at the time of the murder, and by Jones as being one of two shooters. *Id*. After he refused to speak with police, Defendant Officers took no steps to investigate his possible involvement. App. 7; R. Doc. 224 at 7.

### VIII. Plaintiff is Charged Based Solely on Unreliable Statements

Rather than resolve the conflicting and incriminating evidence as to these three alternate suspects, Defendant Officers instead elected to have Plaintiff alone

16

arrested for the murder of Larry White—based solely on the problematic statements of Lockett and Morrow described above. Following his October 14, 2003 arrest for murder, Plaintiff was interrogated and denied any involvement—as he continued to do throughout his criminal case. App. 6; R. Doc. 224 at 6.

## IX.    Plaintiff is Wrongfully Convicted

In April 2005, a jury convicted Plaintiff of White's murder, based on the testimony of Morrow and Lockett. App. 7; R. Doc. 224 at 7. Plaintiff filed a motion for a new trial contending that he had been unfairly surprised by Lockett's testimony and was deprived of the opportunity to interview her prior to trial. App. 7; R. Doc. 224 at 7; App. 312; R. Doc. 139-4. The trial court granted that motion and set aside the verdict. *Id.*

Plaintiff was tried a second time, this time before the bench. App. 7; R. Doc. 224 at 7. At that trial, both Lockett and Morrow testified consistent with the statements Defendant Officers had obtained from them. App. 7-8; R. Doc. 224 at 7-8. Neither revealed the extent of Defendant Officers' manipulation and coercion to produce their false testimony. None of the participants in the trial, including Plaintiff and his counsel, were provided with the report of Lockett's October 7 interview in which—at odds with her trial testimony—she had been unable to describe or identify the person or persons she saw shooting at White. App. 5; R. Doc. 224 at 5.

17

Felicia Jones was also called by the prosecution (as she had been at the earlier trial) and, unlike Lockett and Morrow, she disavowed her police statement, explaining that she had no idea who shot White and specifically had no memory of Plaintiff shooting anyone. App. 8; R. Doc. 224 at 8. Jones admitted to extensive drug abuse and lack of sleep in the time period surrounding the murder, including that she was high at the time of the murder, causing hallucinations; acknowledged mental illness, including auditory hallucinations; and, confronted with her statement, said she would have said anything to get drugs and that, despite having warrants out for her arrest, officers had dropped her off and given her $5 after she signed the statement. App. 8; R. Doc. 224 at 8; App. 1989; R. Doc. 148 at 42 ¶ 163; App. 1987-88; R. Doc. 148 at 40-41 ¶¶ 158-159; App. 2024; R. Doc. 148 at 77, ¶ 81. Jones also testified that she did not remember giving a statement to the police, but that she did not read well, and would probably not have been able to read any documents, including her statement, officers gave her to review. App. 1990; R. Doc. 148 at 43, ¶ 169. She testified that she remembers someone other than Plaintiff shooting White. App. 2024; R. Doc. 148 at 77 ¶ 81.

Crediting the testimony of Lockett and Morrow, as well as Jones's earlier police statement, the court found Plaintiff guilty, and subsequently sentenced Plaintiff to life imprisonment without the possibility of parole. App. 8; R. Doc. 224 at 8.

Appellate Case: 25-1490    Page: 27    Date Filed: 07/24/2025 Entry ID: 5541141

## X.  Plaintiff is Exonerated

During the investigation of Plaintiff's post-conviction case, an investigator obtained the October 7, 2003 report of Lockett's initial interview. App. 9; R. Doc. 224 at 9. Lockett and Morrow also recanted their testimony implicating Plaintiff, explaining that they had been coerced to falsely identify Plaintiff as the shooter by Defendants, even though it was not true. App. 9-11; R. Doc. 224 at 9-11.

Morrow also provided consistent sworn testimony describing her interactions with McGowan as occurring before Morrow's interrogation by Blehm and Williamson on October 12, 2003. App. 1458-59; R. Doc. 147 at 15-16 ¶¶ 4-8; App. 10; R. Doc. 224 at 10.

In September 2020, Plaintiff filed a petition for writ of habeas corpus in the Missouri Supreme Court challenging his convictions. That court appointed a special master to conduct a hearing and consider Plaintiff's arguments. App. 9; R. Doc. 224 at 9. The special master found that the October 7, 2003 report was material, exculpatory evidence that had not been disclosed to Plaintiff or the prosecutor's office prior to Plaintiff's trials and that Plaintiff was therefore entitled to habeas corpus relief. App. 9-10; R. Doc. 224 at 9-10. Plaintiff's convictions were vacated. The State thereafter dismissed the charges. App. 10; R. Doc. 224 at 10.

19

## XI.    These Proceedings

Plaintiff filed this suit against Defendants Blehm and Williamson, other Kansas City police investigators, and Defendant McGowan alleging a variety of constitutional claims against the defendants arising from his wrongful conviction and years of false imprisonment. App. 70; R. Doc. 1.

At summary judgment, the district court dismissed certain defendants and certain claims but rejected Defendant Officers' qualified immunity defense as to Plaintiff's constitutional claims for suppression of the October 7 Lockett report and for conducting a reckless investigation in violation of due process. The district court also rejected Defendant McGowan's prosecutorial immunity, qualified immunity and official immunity claims, allowing Plaintiff's claims against Defendant McGowan for suppression and fabrication of evidence to proceed to trial.

In their appeal, Defendant Officers challenge the district court's immunity ruling as to the reckless investigation claim (but not the suppression of evidence claim). McGowan's appeal challenges the district court's finding that she cannot establish prosecutorial and other immunities as a matter of law.

20

## SUMMARY OF THE ARGUMENT

This brief responds to the arguments of Defendant Officers in Case No. 25-1490 and to the arguments of prosecutor McGowan in Case No. 25-1515.

**Defendant Officers** contend they are entitled to qualified immunity as to Plaintiff's claim that they conducted a reckless, conscience-shocking investigation of the White murder. This argument is defeated by application of settled authority in this Circuit to the facts in the record and reasonable inferences therefrom.

Defendant Officers pressured three vulnerable, drug-addicted prostitutes from the neighborhood of the murder to identify Plaintiff as the shooter. One witness, Wendy Lockett, was a confidential informant. In an interview with police the day after the murder, she could only describe the murderer as a "Black male." Later, Defendant Officers pressured Lockett to name Plaintiff, prepared a statement for Lockett to that effect, and concealed and suppressed the report of the original interview.

Lorrianne Morrow told McGowan and, later, Defendant Officers, that she had witnessed Gary Kitchen and Reginald Thomas commit the murder. After speaking with Defendant Officers, Morrow revised her statement to say, instead, that Plaintiff was the person who shot White. Defendant Officers did not record Morrow's initial statement implicating Kitchen and Thomas. Both Lockett and Morrow asserted in their statements that Plaintiff shot White, execution style, at

21

close range in the parking lot of the Fish Town restaurant, where White collapsed and died. This was provably false and at odds with the physical evidence.

Felicia Jones was deeply in the throes of drug addiction and mental illness. She experienced hallucinations and was strung out, as Defendant Officers knew or should have known. Nonetheless, they pressured her to name Plaintiff as the shooter, even though she had no idea who committed the crime.

As Defendant Officers were building a false case against Plaintiff based exclusively on the unreliable statements of the three witnesses, they were also learning information that inculpated Kitchen and Thomas. They located the murder weapon and established that it belonged to Kitchen, who had hidden it in a vacant apartment next to the apartment being used by Arnold ("O.G.") Carr to run a drug operation. On the night of the murder, Thomas was overheard in Carr's apartment saying "make him disappear" in relation to the victim, who had been selling drugs on Carr's turf.

Defendant Officers questioned Kitchen and Thomas about their whereabouts at the time of the murder. Their statements were shifting and conflicting. Kitchen initially said he was nowhere near the murder scene on the day of the crime, then admitted he was, but said he left shortly before the murder. Thomas said he was not in the neighborhood on the day of the crime and that he had been with Kitchen starting at 3:00 p.m., a statement that was irreconcilable with Kitchen's account.

22

Defendant Officers did not take any steps to further investigate Kitchen and Thomas and, instead, asked for charges to be brought against Plaintiff.

The district court correctly found that, in its totality, Defendant Officers' investigation was reckless and conscience shocking. They pressured witnesses, suppressed exculpatory evidence, built a case against Plaintiff exclusively on unreliable, drug-addicted eyewitnesses, and ignored and failed to pursue concrete, compelling evidence against other suspects. This case is governed by cases like *Winslow v. Smith*, 696 F.3d 716 (8th Cir. 2012) and *Walz v. Randall,* 2 F.4th 1091, 1104 (8th Cir. 2021).

Defendant **McGowan** argued for prosecutorial immunity in her motion for summary judgment. Plaintiff alleges that, during the investigation and before charging, she acted as an investigator, "rolling up on" Morrow and questioning her about the White murder. In that questioning, according to Morrow, McGowan told Morrow that Plaintiff committed the murder, rejecting Morrow's initial statement that Kitchen and Thomas were the murderers. McGowan threatened Morrow with the loss of her children and with false drug charges if Morrow did not agree that Plaintiff committed the crime.

Prosecutorial immunity does not shield McGowan from liability for concealing her coercive interactions with Morrow and for fabricating Morrow's identification of Plaintiff because, at the time of those interactions, McGowan was

23

acting in an investigative, not a prosecutorial role. *Buckley v. Fitzsimmons,* 509 U.S. 259 (1993).

McGowan, who does not remember this case, contends that her interactions with Morrow could only have occurred when she was preparing the case against Plaintiff for trial and acting in her prosecutorial, immunized role. But that contention creates a dispute of fact that cannot be resolved at summary judgment, and the district court was correct to reject her prosecutorial immunity defense.

McGowan's alternative contentions that she is entitled to qualified immunity must be rejected because they were never made to the district court and they are not properly developed in her brief to this court with citations to the record and to the governing cases. Those arguments are therefore waived and forfeited.

McGowan is not entitled to official immunity as to Plaintiff's state law claims because there are sufficient facts in the record from which a reasonable jury could conclude that McGowan acted in bad faith or from an improper motive.

24

**ARGUMENT**

I. **THE DISTRICT COURT PROPERLY REJECTED QUALIFIED IMMUNITY AS TO PLAINTIFF'S CLAIM THAT THE DEFENDANT OFFICERS CONDUCTED A RECKLESS INVESTIGATION IN VIOLATION OF DUE PROCESS**

### A. The Right to Be Free of Reckless Investigation Was Clearly Established at the Time of the Investigation in this Case.

The district court held that Plaintiff presented sufficient evidence of Defendant Officers' conscience-shocking investigative failures to require a jury trial as to whether Defendant Officers violated Plaintiff's due process right to a non-reckless investigation. *See* App. 20-23; R. Doc. 224 at 20-23.

This Court's precedents extending over decades have held and reiterated that a person under criminal investigation has a due process right to expect that the investigating officers will not act recklessly. "A police officer's failure to adequately investigate a criminal case may violate the suspect's constitutionally protected interested in 'obtaining fair criminal proceedings before being denied one's liberty in the most traditional sense.'" *Walz v. Randall,* 2 F.4th 1091, 1104 (8th Cir. 2021); *see also Winslow v. Smith,* 696 F.3d 716, 739 (8th Cir. 2012) (holding that the right to be free of reckless investigation was "clearly established" in 1989); *Wilson v. Lawrence County,* 260 F.3d 946, 955, 957 (8th Cir. 2001) (failing to investigate other leads in the absence of reliable evidence implicating the plaintiff was reckless); *White v. Smith*, 696 F.3d 740, 758 (8th Cir. 2012)

25

(upholding the denial of summary judgment where the defendants "repeatedly ignored inconsistencies and implausibilities in the testimony implicating [plaintiff] and exercised systematic pressure to procure [plaintiff's] conviction despite the unreliability of the evidence that he was involved"); *Moran v. Clarke*, 296 F.3d 638, 647-48 (8th Cir. 2002) ("purposely ignor[ing] evidence that strongly tended to exonerate" the plaintiff—even in the face of incriminating eyewitness statements— was sufficient to show a violation of due process through reckless investigation).

As the district court noted, no party below contended that the right to be free of reckless investigation was anything other than clearly established as of the 2003 events in issue in this case. *See* App. 23; R. Doc. 224 at 23. It undoubtedly was. *Id.*

### B. The District Court Correctly Held that a Reasonable Jury Could Conclude that Defendant Officers' Investigation was "Reckless" and "Conscience Shocking."

Distilling this Court's line of cases on reckless investigation, the district court identified three circumstances that "indicate reckless or intentional failure to investigate that shocks the conscience:" (1) evidence that the investigators attempted to coerce or threaten the plaintiff; (2) evidence that investigators recklessly or purposefully ignored evidence suggesting the plaintiff's innocence; and (3) evidence that investigators exerted systematic pressure to implicate the defendant in the face of contrary evidence. App. 20; R. Doc. 224 at 20, citing *Walz,*

26

2 F.4th at 1104. Defendant Officers adopt this summary of how a plaintiff may establish a claim for reckless investigation. *See* Def. Officers Br. at 19-20.

Measured against this framework, there is ample evidence that would allow a reasonable jury to find that Defendant Officers acted with conscience-shocking recklessness. *First,* the jury could conclude that Defendant Blehm knew of and deliberately suppressed evidence that Wendy Lockett, a primary eyewitness, had failed, when police interviewed her the day after the crime, to provide any identification of two Black males she saw pursuing Larry White and shooting at him. The district court so found, *see* App. 27; R. Doc. 224 at 27, and Defendant Officers do not dispute that finding on appeal. This suppressed evidence powerfully undermines Lockett's trial testimony that Plaintiff alone pursued White shooting a gun with a "banana-like clip," like the murder weapon Defendant Officers had recovered before interrogating Lockett a second time. App. 6-8; R. Doc. 224 at 6-8.

*Second,* a reasonable jury could conclude that Defendant Officers, by failing to record the information, also suppressed the fact that Lorriane Morrow had initially told them that Reginald Thomas and Gary Kitchen pursued and shot White—only changing her account to implicate Plaintiff under questioning from Defendant Officers. App. 5, 10; R. Doc. 224 at 5, 10; App. 2023; R. Doc. 148 at 76 ¶¶ 72, 74. This information, which Defendant Officers admit should have been

27

recorded and provided to Plaintiff's criminal defense counsel (*see* Def. Officers Br. at 28), gravely undermined Morrow's later statement implicating Plaintiff.

*Third,* a reasonable jury could conclude that Lockett and Morrow, along with Felicia Jones, the third eyewitness, were deeply compromised and unreliable witnesses—since all of them were in the throes of addiction and vulnerable to arrest and prosecution if they did not cooperate with Defendant Officers. App. 1977; R. Doc. 148 at 30, ¶ 112; App. 6, 8, 10; R. Doc. 224 at 6, 8, 10; App. 1989; R. Doc. 148 at 42 ¶ 163; App. 1987-88; R. Doc. 148 at 40-41, ¶ 158-159; App. 2024; R. Doc. 148 at 77, ¶ 81.

*Fourth,* a reasonable jury could credit the recantations that all three of these witnesses have since provided, indicating that none of the three saw Plaintiff pursue and shoot at Larry White. App. 8-11; R. Doc. 224 at 8-11.

A jury could believe the eyewitnesses' subsequent testimony that Defendant Officers prompted all three to identify Plaintiff as the shooter by suggesting that fact to them, feeding them information about how the crime occurred, and using their power and authority to push them to identify Plaintiff. *Id.*

*Fifth,* a reasonable jury could conclude that independent of and/or in addition to the recantations and Defendant Officers' feeding of information, the eyewitness statements were obviously inaccurate and to be treated with skepticism because they described Plaintiff executing White in the Fish Town parking lot with

28

multiple close range shots to the head, when the physical evidence from the scene showed that could not have happened. App. 2024; R. Doc. 148 at 77, ¶ 84; App. 2024-25; R. Doc. 148 at 77-78 ¶¶ 83-85. Defendant Officers themselves admit they may have been "negligent" in failing to probe the basis for such obviously false information. *See* Def. Officers' Br. at 29.

*Sixth,* a jury could find that, apart from the three eyewitnesses, there was no evidence that Plaintiff killed Larry White. The jury could find that Defendant Officers knew that fact and also knew that they had pressured and improperly influenced each of the eyewitnesses to name Plaintiff.

Not only could a jury conclude that Defendant Officers lacked any credible information that Plaintiff killed Larry White, the jury could also find that Defendant Officers *did* have such information against Gary Kitchen, Reginald Thomas and Mitchell Powell, but deliberately declined to pursue it in favor of closing their investigation and charging Plaintiff.

*Seventh,* Defendant Officers' investigation revealed that the gun used to kill Larry White, an assault rifle, was owned by Gary Kitchen, who had hidden the weapon in a vacant apartment associated with O.G. Carr's drug operation. App. 4; R. Doc. 224 at 4; App. 2026; R. Doc. 148 at 79 ¶ 97. In the statement Defendant Officers failed to record, eyewitness Morrow said that Kitchen and Reginald Thomas together pursued White and shot him. App. 5, 10; R. Doc. 224 at 5, 10;

29

App. 2023; R. Doc. 148 at 76 ¶¶ 72, 74. When questioned, Kitchen provided varying accounts of his whereabouts on the day of the murder, initially telling investigators that he was nowhere near the scene of the murder, then shifting course and admitting to Defendant Officers that he was at the scene that day, but claiming that he had left and gone to his nearby apartment shortly before the shooting took place. App. 2026; Doc. 148 at 79 ¶ 97; App. 6; R. Doc. 224 at 6.

*Eighth,* Defendant Officers also had information pointing to Reginald Thomas as a possible suspect. In addition to Morrow's initial (unrecorded) statement that Thomas was a shooter, Defendant Officers learned from Felicia Jones that, sitting on a couch in O.G. Carr's apartment, Thomas had said "make him disappear" referring to Larry White. App. 7; R. Doc. 224 at 7. Witness Margo Thomas (no relation to Reginald) also told investigators that Reginald was at the Carr apartment on the night of the shooting. App. 6; R. Doc. 224 at 6.

Thomas was interrogated and told investigators that, starting after 3:00 p.m. and for the rest of the night, he was with Kitchen and other members of Kitchen's family—a statement that was contradicted by *Kitchen*'s assertion that, contrary to Thomas's account, Kitchen had been in the area of the crime until the evening hours as well as by Kitchen's failure to list Thomas among the people Kitchen was with when Kitchen was questioned. Thomas also denied ever being in the Carr

30

apartment on the night of the shooting, but that claim as well was undercut by Jones and Margo Thomas, who both placed him in the apartment that evening.

Defendant Officers made no effort to pursue and resolve these discrepancies—all of which pointed away from Plaintiff and toward Kitchen and Thomas as alternative suspects. There is no record that Defendant Officers ever spoke with other witnesses regarding the conflicting, self-serving alibis that Kitchen and Thomas offered to investigators. Defendant Officers do not appear to have asked who, in addition to Jones, overheard Thomas's threatening statement ("make him disappear"). Nor is there any record of Defendant Officers investigating what Thomas or anyone else (including Kitchen) did following the threatening statement. No investigative document reflects any questioning of Kitchen as to who had access to his assault rifle on the night of the murder, when he personally last possessed the gun, or how the gun came to be in Carr's apartment.

In short, Defendant Officers knew that Kitchen owned the weapon used to kill White. App. 4; R. Doc. 224 at 4; App. 2026; R. Doc. 148 at 79 ¶ 97. Defendant Officers obtained information that, on the night of the murder, Thomas said he wanted White killed. App. 7; R. Doc. 224 at 7. Morrow said Kitchen and Thomas committed the murder together—though Defendant Officers chose not to record the statement. App. 5, 10; R. Doc. 224 at 5, 10; App. 2023; R. Doc. 148 at 76 ¶¶

31

72, 74. Each man provided unreliable, contradictory accounts of his whereabouts at the time of the murder—undermined by multiple witnesses. Yet Defendant Officers chose not to resolve any of this evidence and charged Plaintiff instead—doing so based on factually dubious statements they had fed to and extracted from vulnerable, unreliable witnesses.

*Ninth,* in addition to the evidence implicating Kitchen and Thomas, Felicia Jones told investigators that Mitchell Powell was one of two Black men who chased and shot Larry White. App. 7; R. Doc. 224 at 7. Wendy Lockett also told Defendant Officers that Powell was present at the time of the shooting. App. 6; R. Doc. 224 at 6. Powell was a less compelling suspect than Kitchen and Thomas, to be sure, but there is no evidence in the record that Defendant Officers took any investigative measures to resolve whether Powell was a participant in the shooting. Like Kitchen and Thomas, Powell was known to sell drugs out of the Carr apartment and shared their motive to eliminate White, who was selling on their turf. App. 22; R. Doc. 224 at 22.

As the district court observed, App. 20; R. Doc. 224 at 20, the inquiry into whether an investigation was reckless or conscience-shocking must necessarily be "context specific." There is no doubt that a jury could find that, in context, this investigation "shocks the conscience." The jury could find that Defendant Officers recklessly or purposefully "ignored evidence suggesting [Plaintiff's] innocence"—

32

one of the three avenues this Court has identified for showing reckless investigation. *Walz,* 2 F.4th at 1104. That alone is sufficient to require a trial. This Court has held unequivocally that "[d]efendants may be held liable [for reckless investigation] if they recklessly ignored evidence suggesting Plaintiff's innocence." *Winslow,* 696 F.3d at 734.

Defendant Officers possessed at least the following evidence "suggesting [Plaintiff's] innocence": (1) the weapon used to commit the murder belonged to someone else; Plaintiff was never connected to the assault rifle; (2) another person had expressed the desire that the victim be eliminated; (3) the eyewitness evidence purporting to identify Plaintiff came from unreliable, vulnerable witnesses who had been fed information and manipulated to identify Plaintiff; and (4) apart from Plaintiff's mere presence in the neighborhood and the concocted eyewitness identifications, there was no evidence against Plaintiff. Defendant Officers ignored all the above.

A reasonable jury could also find that Defendant Officers "exerted systematic pressure to implicate the defendant in the face of contrary evidence"—another of the avenues identified in *Walz* for establishing that an investigation is reckless and conscience shocking. 2 F.4th at 1104. The jury could find that Defendant Officers "systematically pressured" Lockett, Morrow and Jones to inculpate Plaintiff in the face of clear evidence that none of the witnesses could

33

reliably do so: Lockett was not able to identify the offenders (as she plausibly told Officers Huth and Begley the day after the crime); Morrow saw Kitchen and Thomas chasing and shooting at White (as she told Defendant Officers before she identified Plaintiff under Defendant Officers' questioning); Jones was so deep in addiction that she could not be relied upon for any account. Notwithstanding these problems, Defendant Officers pushed all three women to identify Plaintiff as the murderer. This is a case, like *Winslow,* 696 F.3d at 735, in which Defendant Officers "pressed ahead" despite obvious "red flags" that should have alerted them they were on the wrong track. Here, like *Winslow,* Defendant Officers "purposefully ignored the fact that no witness could independently provide testimony" inculpating Plaintiff. *Id.* at 736.

Moreover, Defendant Officers "ignored inconsistencies and implausibilities in the testimony" of Lockett and Morrow implicating Plaintiff. Defendant Officers ignored the fact that their statements described an execution-style shooting in the Fish Town parking lot that was obviously impossible. That scenario was flatly contradicted by the physical and forensic evidence from the scene. *Cf. White,* 696 F.3d at 758 (police officers' pressuring co-defendant witnesses to provide implausible and inconsistent statements implicating the plaintiff may be conscience shocking). Similarly, Defendant Officers ignored the fact that Lockett identified

34

Damon Rhodes as a culprit, which was necessarily false since he had an indisputable alibi. App. 6; R. Doc. 224 at 6.

As the investigation turned up evidence pointing to Kitchen and Thomas (and also suggesting the possible involvement of Powell), Defendants remained singularly focused on Plaintiff and ignored that evidence. This Court has also held, without equivocation, that failing to investigate other leads when there is no reliable evidence against the plaintiff—as a jury could find happened here—is reckless and conscience shocking. *Wilson,* 260 F.3d at 957.

Defendant Officers rely principally upon the case of *Amrine v. Brooks,* 522 F.3d 823 (8th Cir. 2008), which rejected the plaintiff's reckless investigation claim. There, this Court found that it was not conscience shocking for officials investigating a prison murder to focus their attention on one prisoner who was present at the scene of the murder while failing to pursue another possible suspect. In *Amrine,* unlike this case, objective physical evidence *inculpated* the plaintiff and provided substantial justification for not pursuing the alternate suspect. *See id.* at 832-33 (distinguishing *Kuehl v. Burtis*, 173 F.3d 646 (8th Cir. 1999), where investigators "ignored physical evidence"). In *Amrine,* there was "no evidence that the investigators consciously suppressed potentially exculpatory evidence." 522 F.3d at 835. The opposite is true here. In *Amrine,* the record contained "no evidence" that the defendants "recklessly pinned the murder on a convenient

35

suspect." *Id.* That is not true of this case. There is nothing in the fact-specific *Amrine* opinion to suggest that the district court erred in holding that a jury could find the very different facts of the White murder investigation to be conscience shocking.

Defendant Officers also cite *Clemmons v. Armontrout,* 477 F.3d 962 (8th Cir. 2007), a case that is equally unhelpful to them. *Clemmons,* also a prison murder case, centered on investigators' failure to follow up on the statement of a single witness naming an alternative suspect. But, according to the investigator who spoke to the witness, the witness was "not making sense" and "not credible." *Id.* at 964. In that context, this Court found that the investigative failure may have been negligent but was not conscience shocking. *Id.* at 966. The facts of this case are very different.

In sum, the district court correctly analyzed the question of whether a reasonable jury could find that Defendant Officers' investigation was reckless and conscience shocking and properly resolved that question in Plaintiff's favor.

### C. Defendant Officers Cannot Succeed on Appeal by Attempting to Recast the Facts So as to Minimize or Excuse Their Misconduct.

Defendant Officers attempt to recast their actions as merely negligent by offering innocent or non-reckless explanations for some investigative lapses in isolation. For example, it was not reckless to fail to search Powell's residence at

36

the time of his arrest because the arrest was many weeks after the crime. Def. Officers Br. at 21-22. Defendant Officers cannot be faulted for failing to check out Powell's alibi because he refused to speak after his arrest. *Id.* at 22-23. They did not need to investigate Powell, Kitchen, and Thomas because Lockett, Morrow, and Jones had all implicated Plaintiff. *Id.* at 23-25. It would not have been "fruitful" to question the alibis of Thomas and Kitchen. *Id.* at 25. Thomas's statement that White should be made to "disappear" did not equate to Thomas being a shooter. *Id.*

There are two fundamental problems with this kind of argument. *First,* the defendant in a reckless investigation case cannot defeat liability by asking this Court to treat each investigative lapse in isolation and determine whether the conscience would be shocked by that lapse alone. Instead, this Court has repeatedly made clear that, to decide whether an investigation is reckless and conscience shocking the Court must evaluate the entirety of the investigation. Determining whether an investigation violates due process and shocks the conscience requires "an appraisal of the totality of the circumstances rather than a formalistic examination of fixed elements." *Engesser v. Fox*, 993 F.3d 626, 630 n.3 (8th Cir. 2021). *Accord Hayes v. Faulkner County*, 388 F.3d 669, 673 (8th Cir. 2004) (whether a defendant's conduct "shocks the conscience" depends upon the "totality of the circumstances").

Thus, Defendant Officers cannot prevail by furnishing justifications for their failures to take particular investigative steps. For example, Defendant Officers contend that their failure to pursue an investigation of Powell was "not to [Plaintiff's] detriment because Lockett, Morrow and Jones had given statements "that [Plaintiff] was in the area of the homicide and shot White." Def. Officers Br. at 23. That justification ignores all the evidence of Defendant Officers' misconduct in procuring the three statements, the contrary statements of Lockett and Morrow that Defendant Officers deep sixed, and the factual unreliability of all three statements—among other things. This argument, and others like it, miss the point. The record of the investigation has to be considered *as a whole* to assess whether Defendant Officers violated due process. The "formalistic examination of fixed elements" of the investigation, while pushing aside the whole course of the investigation, cannot furnish a basis for reversal. *See Engesser*, 993 F.3d at 630 n.3.

In other words, these arguments do not come to grips with the overarching recklessness of this investigation: Defendant Officers built a case against Plaintiff by pressuring vulnerable witnesses, ignoring evidence that did not fit their theory, closing their eyes to the disconnects between the witnesses' statements and the physical evidence, failing to pursue suspects with obvious motive to commit the crime and as to whom there was far more compelling evidence. These things—*in*

38

*toto*—bring this case within the ambit of precedents like *Wilson, Moran, White,* and *Winslow* and make it reasonable for a jury to find that Defendant Officers' actions are conscience shocking.

*Second,* this appeal does not afford Defendant Officers the opportunity, divorced from any abstract issue of law, to reargue the facts of the case and, in effect, ask this Court to reconsider the summary judgment ruling below. In *Taylor v. St. Louis Community College*, 2 F.4th 1124, 1127-28 (8th Cir. 2021), this Court dismissed an interlocutory immunity appeal because, to consider the issues raised in the appeal, "we would have to exceed our jurisdiction and cast aside the district court's factual findings, analyze the factual record, and resolve genuine factual disputes against the non-moving party. This we cannot do." *Accord Franklin for Estate of Frankin v. Peterson*, 878 F.3d 631, 637 (8th Cir. 2017) (declining to exercise interlocutory immunity jurisdiction where "what is at issue here are the facts themselves" and not a question of law).

Throughout their argument, Defendant Officers ask this Court to do exactly what *Taylor* and *Franklin* prohibit: they seek reconsideration of the inferences that the district court made with respect to the disputed facts in the summary judgment record. *See* Def. Officers Br. at 20-26. By way of example, Defendant Officers argue that their failure to investigate the conflicting alibis of Kitchen and Thomas would not "be fruitful" since each served as the other's alibi witness and more than

39

a week had passed since the homicide. Def. Officers Br. at 25. The district court, considering this investigative omission in context, drew the contrary inference that a reasonable jury could deem this omission to be reckless:

> Officer Defendants did not follow up with either Kitchen or Thomas to understand the potential discrepancies (e.g., why Kitchen didn't tell police he was with Thomas or why Thomas said he was with Kitchen at 2700 Park Avenue from 3:05 p.m. on while Kitchen admitted to selling drugs in the area of the shooting during the evening hours). Despite the conceivable conflict in Kitchen and Thomas' alibis, Morrow's eyewitness statement that she saw Kitchen yielding a firearm and chasing White during the shooting, and Jones' and Margo Thomas' statements placing Thomas at 2404 East 29th Street at the time of the murder in direct conflict with Thomas' alibi, no further steps were taken to corroborate or question Kitchen or Thomas' alibis. (Doc. 139-21 at 84; Doc. 153 at 22 ¶ 80.)

App. 21; R. Doc. 224 at 21.

This Court, on interlocutory review of the district court's denial of qualified immunity, cannot pass judgment on the district court's analysis of the facts in the record or draw inferences in that record against Plaintiff, in plain violation of the summary judgment standard. *Taylor*, 2 F.4th at 1127-28. Rather, in this review, this Court must accept the district court's analysis of the facts. The only question in this appeal is whether the district court properly applied this Court's precedents to hold that a reasonable jury could find Defendant Officers' investigation of the White murder to be "reckless" and "conscience shocking." The district court did exactly that.

40

For all the reasons set forth in this Section, the district court committed no error in so holding.

## II. THE DISTRICT COURT PROPERLY REJECTED DEFENDANT MCGOWAN'S IMMUNITY CLAIMS AT SUMMARY JUDGMENT

Defendant McGowan moved for summary judgment contending that she is entitled to prosecutorial immunity as to Plaintiff's federal claims against her; that, alternatively, she is entitled to qualified immunity as to those claims; and that the Missouri doctrine of official immunity shields her from liability for Plaintiff's state law claims for malicious prosecution and intentional infliction of emotional distress. The district court properly rejected all these immunity defenses.

### A. The District Court Properly Found that McGowan Cannot Sustain Her Prosecutorial Immunity Defense at Summary Judgment.

The district court denied McGowan's request for summary judgment based on prosecutorial immunity because the facts necessary to resolve whether that immunity applies are in dispute. App. 41; R. Doc. 224 at 41. The district court was plainly correct.

No party to this appeal disputes that prosecutors like Defendant McGowan have immunity from suit for their performance of traditional prosecutorial functions. Nor is there any dispute that that immunity does not shield a prosecutor when she engages in investigative actions. *See Buckley v. Fitzsimmons,* 509 U.S.

41

259, 273 (1993) (prosecutorial immunity does not apply "[w]hen a prosecutor performs the investigative functions normally performed by a detective or police officer"); *Woodworth v. Hulshof*, 891 F.3d 1083, 1089 (8th Cir. 2018) (prosecutorial immunity does not extend to "investigatory functions that do not relate to the initiation of a prosecution or for judicial proceedings"). *Accord. Stockley v. Joyce,* 963 F.3d 809, 817 (8th Cir. 2020) (cited by McGowan).

Plaintiff's suppression and fabrication of evidence claims against McGowan are premised on McGowan's interactions with Lorianne Morrow. Morrow has repeatedly testified that McGowan rejected Morrow's firsthand account of who killed Larry White, fed Morrow contrary information as to who committed the crime, and threatened Morrow with the loss of her children and with prosecution for fabricated drug offenses if Morrow did not go along with McGowan's version of what happened.

Morrow repeatedly testified in her deposition in this case that McGowan's threats and coercion took place prior to Morrow's October 12 police interview, when Morrow "rolled up on" on the street a few days after the murder and prior to the lodging of criminal charges against Plaintiff. App. 1144, 1153; R. Doc. 139-24 at 26-27, 61-63. McGowan, though she does not recall her participation in the case prior to charging and has no recollection of Morrow, insists that all her conversations with Morrow must have occurred after charges were filed as

42

McGowan was preparing the criminal case against Plaintiff for prosecution. App. 1324, 1329; R. Doc. 140-1 at 34, 53.

Crediting Morrow's account, McGowan was performing "investigative functions normally performed by a detective or police officer" and would not be entitled to prosecutorial immunity. *Buckley*, 509 U.S. at 275 (absolute immunity is not available to a prosecutor who fabricates evidence "during the preliminary investigation of an unsolved crime"); *accord. McGhee v. Pottawattamie Cnty.*, 547 F.3d 922, 929 (8th Cir. 2008) ("Before the establishment of probable cause to arrest, a prosecutor generally will not be entitled to absolute immunity … [O]btaining, manufacturing, coercing and fabricating evidence before filing formal charges … is not a distinctly prosecutorial function").

If McGowan's version is accepted, the opposite result follows. Prosecutors have immunity for claims "arising from their initiation of a prosecution and presenting a criminal case 'insofar as that conduct is intimately associated with the judicial phase of the criminal process.'" *Sample v. City of Woodbury*, 836 F.3d 913, 916 (8th Cir. 2016) (quoting *Burns v. Reed*, 500 U.S. 478, 486 (1991)). McGowan's account—she interviewed Morrow post-charging during her work on the criminal case—would afford her immunity.

The disputed timing of McGowan's interactions with Morrow cannot be resolved on summary judgment, when the court must view the facts in the light

43

most favorable to the nonmoving party and must draw all justifiable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court's function at this stage is not to weigh witness credibility but to determine whether there is a genuine issue for trial. *Id.* at 249.

Straightforward application of the summary judgment standard requires the rejection of prosecutorial immunity at this stage. As the district court noted, "McGowan as much as concedes that this factual dispute [as to timing] defeats her argument that she is entitled to absolute prosecutorial immunity, as she argues only that the uncontroverted facts establish that her alleged interviews with Morrow occurred after charges were filed." App. 40; R. Doc. 224 at 40. McGowan takes the same position on appeal. Her argument for prosecutorial immunity rests exclusively upon the contention that Morrow's sworn testimony about the timing of the interactions with McGowan must be disbelieved or disregarded and McGowan's account as to the timing must be accepted.

McGowan relies on *Garang v. City of Ames,* 2 F.4th 1115 (8th Cir. 2021), but that case does not support her. In *Garang,* the plaintiff contended that he had been arrested without probable cause. The existence of probable cause turned on whether an eyewitness had identified plaintiff prior to the arrest. 2 F.4th at 1120. The defendants moved for summary judgment. The eyewitness testified in his deposition that he did not recall making the identification of the plaintiff but

44

assumed that he had. *Id.* at 1122. The defendant investigator testified that the witness had made an ID. *Id.* at 1119. In his deposition, the plaintiff had testified that he could not hear the conversation between the witness and the investigator-defendant—and thus was not able to contradict the testimony that the identification had occurred. *Id.* at 1122. Thus, based on the deposition record there was no genuine dispute that the plaintiff was identified by an eyewitness prior to his arrest and that there was probable cause for the arrest.

In opposition to summary judgment, the plaintiff submitted an affidavit averring that he *had* been able to overhear the conversation between the defendant officer and the witness and that the witness did not identify him—a direct contradiction of his prior sworn deposition testimony. *Id.* at 1122. This Court characterized the affidavit as a "sham" because it contradicted the plaintiff's prior testimony and was a "sudden and explained revision of testimony [that] create[ed] an issue of fact where none existed before." *Id.* (quoting *Button v. Dakota, Minn. & E. R.R. Corp.,* 963 F.3d 824, 830 (8th Cir. 2020). The Court disregarded the sham affidavit and granted summary judgment based on the deposition testimony that there was an identification. 2 F.4th at 1122-23.

McGowan attempts to apply *Garang* to this case arguing that Morrow's deposition testimony is as unworthy of consideration as the plaintiff's sham affidavit in *Garang*. But this case is entirely different. Morrow is a disinterested

45

third-party witness; she is not the plaintiff in the case. Morrow did not submit a last-minute affidavit that contradicted her deposition testimony. To the contrary, over two days of questioning, Morrow repeatedly testified that she spoke with McGowan first—prior to her documented October 12 police interview and prior to the October 14 filing of charges against Plaintiff. App. 1144, 1153; R. Doc. 139-24 at 26-27, 61-63.

Morrow's extensive testimony, given in multiple sessions over the course of several years, is not remotely comparable to the last-minute, self-serving affidavit that this Court disregarded in *Garang.* Her testimony should not be disregarded. *Cf. Russell v. Acme-Evans Co.,* 51 F.3d 64, 67-68 (7th Cir. 1995) (courts disregard sham affidavits because affidavits are typically drafted by attorneys; unlike affidavits, there is a possibility that a deposition "question was phrased in a confusing manner or because a lapse of memory is in the circumstances a plausible explanation for the discrepancy"); *Gullick v. Ott,* 517 F. Supp. 2d 1063, 1075 (W.D. Wis. 2007) (sham affidavit rule does not apply when inconsistencies come from the same deposition; "when a witness gives contradictory testimony at trial, it is a relevant consideration for the jury, but it is not a ground for striking the testimony or declaring the witness incompetent to testify on the matter"). [2]

---

[2] McGowan cites *Conolly v. Clark,* 457 F.3d 872 (8th Cir. 2006) as support for the proposition that documentary evidence trumps affidavit testimony. That was true in

46

McGowan points to failures in Morrow's memory about events covered in her testimony. *See* McGowan Br. at 21 ("Morrow testified repeatedly that she could not remember or recall something"). She emphasizes that Morrow cannot remember the precise dates of her meetings with Morrow. *Id.* at 23. McGowan notes that Morrow is not clear about the location of her meetings with McGowan. *Id.* at 22-23. She cites deposition passages in which Morrow is uncertain about details of what was said at the meetings with McGowan. *Id.* McGowan also emphasizes a passage from testimony that Morrow gave in 2021 in which, in response to leading questions from a State's Attorney, Morrow agreed that her meeting with "the prosecutor" was after she had spoken with police. *Id.* at 20; *see* App. 1923; R. Doc. 147-7 at 30:1-12. McGowan contends that Morrow is unworthy of belief. *See* McGowan Br. at 28-29.

These points will be fodder for cross examination at trial. They are not a

_____

*Conolly*, a contract case before the Court on summary judgment, in which governing state law required an "objective" not a "subjective" assessment of whether a contract had been formed, the non-moving party had submitted an affidavit expressing their subjective view that a contract with particularized terms was formed, but the objective email correspondence between the parties showed otherwise. Whatever value *Conolly* has as a statement of contract law, it does not bear on this case. Likewise, McGowan cites *United States v. Provost,* 969 F.2d 617 (8th Cir. 1992) and *United States v. Bear,* 116 F.3d 349 (8th Cir. 1997) for the proposition that this Court "views recantations with suspicion." That may also be true, but it does not speak to the summary judgment standard or the issue in this case. *Provost* and *Bear* both concerned post-trial motions in cases where a prosecution witness had recanted, a wholly different procedural posture than here.

reason to remove Morrow's testimony from the record, as McGowan requests.

Indeed, all of Morrow's testimony—from Plaintiff's two criminal trials, her 2014

affidavit and her depositions in 2021 and 2024—was before the district court,

which concluded:

> A jury could reasonably conclude, based on the totality of Morrow's prior testimony and affidavits, that Prosecutor McGowan's actions (i.e., interviewing a witness twice in the preliminary stage of an investigation before police had interviewed the witness) occurred prior to Morrow's meeting with Officer Defendants, which undisputedly occurred on October 12, 2003, or two days before Plaintiff was arrested and before the probable cause determination occurred.

App. 39; R. Doc. 224 at 39.

In the district court's view, based on the totality of Morrow's sworn

testimony, Morrow, despite the contradictions and the lapses in her memory, has

consistently put forward that it was *McGowan,* not Defendant Officers, who

initially threatened and coerced her into identifying Plaintiff as the shooter. *Id.*

(Morrow makes "consistent allegations" that "McGowan was the driving force

behind her identification of Plaintiff to police"). As the district court put it

elsewhere in the summary judgment ruling, Morrow's "message has stayed the

same." App. 38; R. Doc. 224 at 38.

Whether to accept Morrow's account or McGowan's is, simply put, a

"credibility determination" that is "for the jury." App. 41; R. Doc. 224 at 41;

*United States v. Nosley*, 62 F.4th 1120, 1130 (8th Cir. 2023) ("witness credibility is

48

for the jury to evaluate."); *Gunning v. Cooley*, 281 U.S. 90, 97 (1930) ("the credibility of witnesses and the weight to be given to their testimony are for the jury."); *United States v. Mayfield*, 909 F.3d 956, 963 (8th Cir. 2018) ("the jury is in the best position to assess the credibility of witnesses and resolve inconsistent testimony.").

This Court, exercising its limited interlocutory jurisdiction over an immunity appeal, should not revisit the district court's assessment of the factual record. *See Thompson v. Murray*, 800 F.3d 979, 982-983 (8th Cir. 2015) ("We lack jurisdiction to review the district court's determination regarding evidence sufficiency— *i.e.,* what facts a party may or may not be able to prove at trial. We do not have jurisdiction to review whether a factual dispute is 'genuine.") (internal citations omitted); *Taylor*, 2 F.4th at 1127-28 (it would exceed the court's interlocutory jurisdiction to "cast aside the district court's factual findings" and "analyze the factual record"). Yet that is exactly what McGowan's interlocutory appeal asks this Court to do.

For all these reasons, this Court should reject McGowan's appeal insofar as it challenges the denial of her prosecutorial immunity defense.

### B. The District Court Properly Rejected McGowan's Qualified Immunity Defense.

In her motion below, McGowan offered a one- and one-half page argument

49

that she is entitled to qualified immunity. App. 1309-10; R. Doc. 140 at 17-18. The sum and substance of McGowan's qualified immunity argument was that, in her role as charging attorney, she had no role in Plaintiff's trial and was not personally involved in the concealment of evidence or the introduction of fabricated evidence. *Id.*

The district court thoroughly evaluated this argument and rejected it, concluding that McGowan's argument was foreclosed by this Court's decision in *McGhee v. Pottawattamie Cnty.*, 547 F.3d 922, 932-33 (8th Cir. 2008), which squarely holds that prosecutors who do not participate in the trial are not entitled to qualified immunity for "obtaining, manufacturing, coercing and fabricating evidence before the filing . . . of formal charges," as McGowan is alleged to have done here. App. 41-42; R. Doc. 224 at 41-42.

McGowan does not contest the district court's holding that she can be liable for the concealment of her coercive interactions with Morrow and the fabrication of Morrow's testimony even though she was not the one who presented Morrow's testimony in Plaintiff's criminal trial. She has therefore waived any challenge to the district court's rejection of her sole qualified immunity argument. *See Jenkins v. Winter*, 540 F.3d 742, 751 (8th Cir. 2008) (claims not raised in an opening brief are deemed waived); *United States ex rel. Ambrosecchia v. Paddock Lab'ys, LLC*, 855 F.3d 949, 954 (8th Cir. 2017) (same).

50

Instead of addressing what was argued and decided below, McGowan now contends that the district court "failed [*sic*] short in meeting its threshold duty to conduct a review" of McGowan's qualified immunity claim. McGowan Br. at 34. The Defendant Officers challenged Plaintiff's constitutional claims against them on a claim-by-claim basis. The district court evaluated those arguments, dismissing some of Plaintiff's claims against the Officer Defendants and dismissing certain Kansas City police defendants finding insufficient record evidence against them to warrant a trial. *See generally* App. 14-28; R. Doc. 224 at 14-28. McGowan contends that the district court should have parsed Plaintiff's claims against McGowan in the same manner and dismissed some or all of them based on the insufficiency of the evidence. But in her motion below McGowan nowhere challenged the sufficiency of Plaintiff's evidence that she concealed her coercion of Morrow and fabricated Morrow's inculpatory statement. *See* App. 1293; R. Doc. 140. Nor did she incorporate Defendant Officers' arguments as to those claims. *Id.*

It is baseless to criticize the district court for failing to address contentions McGowan never made. McGowan waived the arguments she now asks this Court to consider by failing to present them to the district court. *See, e.g., Spann v. Lombardi,* 960 F.3d 1085, 1088 (8th Cir. 2020) ("[A] district court does not abuse its discretion by declining to address an argument for summary judgment that is not properly briefed."); *Whittington v. Tyson Foods, Inc.*, 21 F.4th 997, 1002 n.4

51

(8th Cir. 2021) ("[i]f any [] officials [seek] a ruling on qualified immunity as to any particular claim or claims in the pending complaint, then they should have argued the point in their motion," otherwise such arguments are forfeited).

Indeed, it would have been error for the district court to make rulings on issues that McGowan did not present. *Heisler v. Metropolitan Council*, 339 F.3d 662, 631 (8th Cir. 2003) (a district court "commits reversible error when it grants summary judgment on an issue not raised or discussed by the parties"); *Am. Red Cross v. Cmty. Blood Ctr. of the Ozarks*, 257 F.3d 859, 863 (8th Cir.2001) (reversing the grant of summary judgment on three issues not raised in the moving party's motion).

Moreover, the sufficiency of the evidence arguments that McGowan makes for the first time on appeal are undeveloped and cursory. McGowan at no point in her argument cites to the record. She asks for summary judgment because she did not personally suppress the report of Lockett's October 7 interview. *See* McGowan Br. at 35. But the suppression of evidence claim against McGowan concerns McGowan's suppression of her manipulation and coercion of Morrow. In similar fashion, the fabrication claim against Morrow is not the equivalent of the fabrication claims against Defendant Officers. McGowan does not explain why the district court's ruling as to Defendant Officers' liability for evidence fabrication should automatically apply to her. McGowan has waived these purported immunity

52

arguments for the additional reason that she fails to properly develop them. *See e.g., Cox v. Mortgage Electronic Registration System, Inc.*, 685 F.3d 663, 674-675 (8th Cir. 2012) (finding party waived argument by failing to "provide a meaningful explanation of the argument and citation to relevant authority in their opening brief").

Finally, and in any event, there would be no basis for McGowan to make a qualified immunity argument as to the suppression and fabrication of evidence claims against her. She could not plausibly contend that she lacked notice that the actions Morrow attributes to her violated long-established constitutional norms. *See Brady v. Maryland*, 373 U.S. 83 (1963) ("the suppression by the prosecution of evidence favorable to an accused…violates due process whether the evidence is material either to guilt or punishment"); *Pyle v. Kansas*, 317 U.S. 213 (1942); *Mooney v. Holohan*, 294 U.S. 103 (1935); *Brown v. Mississippi*, 297 U.S. 278, 283-85 (1936) (convictions based on evidence fabricated by sheriff's deputies violated due process); *Napue v. Illinois*, 360 U.S. 264, 269 (1959) ("[I]t is established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment.").

This Court should therefore affirm the district court's rejection of McGowan's qualified immunity defense.

Appellate Case: 25-1490    Page: 62    Date Filed: 07/24/2025 Entry ID: 5541141

### C. McGowan is Not Entitled to Official Immunity.

Finally, McGowan argues the district court improperly denied her official immunity with respect to Plaintiff's state law claims. Public employees in Missouri have official immunity from "liability for alleged acts of negligence committed during the course of their official duties for the performance of discretionary acts." *Southers v. City of Farmington*, 263 S.W.3d 603, 610 (Mo. Banc 2008). Official immunity does not apply when the official acts "in bad faith or with malice." *Dreith v. City of St. Louis, Missouri*, 55 F.4th 1145, 1149 (8th Cir. 2022) (quotation omitted). In Missouri, a bad-faith allegation survives summary judgment if there are "facts from which it could reasonably be inferred that [a defendant] acted in bad faith or from an improper or wrongful motive." *Boude v. City of Raymore, Missouri*, 855 F.3d 930, 935 (8th Cir. 2017).

The district court explained that it rejected McGowan's official immunity argument because there are disputes of fact as to McGowan's role in the investigation and because McGowan "fail[ed] to address whether there is evidence from which the jury could find she acted in bad faith or with malice," and therefore waived the argument. App. 43; R. Doc. 224 at 43.

On appeal, McGowan does not make any argument about whether a jury could find she acted in bad faith or with malice. Instead, she simply argues that it was Plaintiff's responsibility to establish such facts. But "a defendant asserting the

Appellate Case: 25-1490    Page: 63    Date Filed: 07/24/2025 Entry ID: 5541141

affirmative defense of official immunity bears the burden of proving it applies." *Kemp v. McReynolds*, 621 S.W.3d 644, 652 (Mo. Ct. App. 2021); *see also State ex rel. Alsup v. Kanatzar*, 588 S.W.3d 187, 193 (Mo. Banc 2019) (defendant "bears the burden of proving this affirmative defense" including whether the actions were performed without malice); *Nguyen v. Grain Valley R-5 Sch. Dist.*, 353 S.W.3d 725, 730 (Mo. App. W.D. 2011).

Regardless of which party bears the burden, there are facts in the record from which it could be reasonably inferred that McGowan acted in bad faith. If the jury credits Morrow and finds that McGowan coerced her to falsely implicate an innocent man to frame him for murder, and then suppressed evidence of that coercion, such a finding would be textbook "bad faith." McGowan does not contest that point.

This Court should therefore affirm the district court's denial of official immunity.

## CONCLUSION

For the foregoing reasons, this Court should affirm the district court's immunity rulings in their entirety and remand this case for a trial on those claims the district court determined survive summary judgment.

Respectfully submitted,

/s/Locke Bowman

*Counsel for Plaintiff-Appellee*
Locke Bowman
Jordan Poole
Loevy and Loevy
311 N Aberdeen
Chicago, Il 60607
312-243-5900
locke@loevy.com

56

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

I hereby certify the following:

1. This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B)(i) because this document contains 12,723 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

Dated: July 24, 2025

/s/ Locke Bowman
*Attorney for Appellee Keith Carnes*

Appellate Case: 25-1490     Page: 66     Date Filed: 07/24/2025 Entry ID: 5541141

## CERTIFICATE OF SERVICE

I hereby certify that on July 24, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

The brief has been scanned for viruses, and the brief is virus-free.

/s/ Locke Bowman

Appellate Case: 25-1490    Page: 67    Date Filed: 07/24/2025 Entry ID: 5541141